IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| INGRAM MICRO INC., <br> Plaintiff, | ) <br> ) <br> ) |
| v. | )    Case No. 1:10cv222 <br> ) |
| ABC MANAGEMENT TECHNOLOGY <br> SOLUTIONS, LLC, et al., <br> Defendants. | ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

At issue on cross motions for summary judgment in this diversity breach of guaranty case is whether defendant Ali Beheshtin is liable for the debts ABC Management Technology Solutions, LLC ("ABC") owes to Ingram Micro Inc. based on the language of a personal guaranty signed by Beheshtin. Beheshtin argues that he is not liable for such debts because, *inter alia*, the amount of ABC's debt exceeds the maximum amount of debt contemplated by the relevant financial agreements.

For the reasons that follow, Beheshtin's various arguments to avoid liability under the guaranty fail.

I.[1]

Plaintiff Ingram Micro, a corporation organized in Delaware with its principal place of business in Santa Ana, California, is a wholesale distributor of technology products. The complaint names three defendants: ABC, Beheshtin, and Robert Prosser. Beheshtin subsequently filed cross claims against Prosser and brought a third party complaint against Cliff Thomas. ABC, a Virginia limited liability company with its principal place of business in

---

[1] The facts recited herein are derived from the pleadings and the record taken as a whole, and are essentially undisputed.

Chantilly, is a reseller of technology products. Beheshtin, Prosser, and Thomas are Virginia residents,[2] each of whom held an ownership interest in ABC at some point in ABC's history. Consent judgments in favor of Ingram Micro have been entered against ABC and Prosser, leaving Beheshtin as the sole remaining defendant. *See Ingram Micro, Inc. v. ABC Mgmt. Tech. Solutions, LLC*, 1:10cv222 (E.D. Va. July 7, 2010) (Consent Judgments). Beheshtin has also voluntarily dismissed his claims against Prosser and Thomas. *See Ingram Micro Inc. v. ABC Mgmt. Tech. Solutions, LLC*, 1:10cv222 (E.D. Va. Sept, 20, 2010) (Order). Thus, Ingram Micro's breach of guaranty claim against Beheshtin is the sole remaining claim in the case.

Beheshtin joined ABC in 2007. Later that same year, ABC began a business relationship with Ingram Micro whereby Ingram Micro sold products to ABC pursuant to a Reseller Application and Agreement dated October 3, 2007 ("Reseller Agreement"). This Reseller Agreement states that the "Credit Limit Amount Requested" is $30,000, a fact that Beheshtin relies upon heavily in his opposition to summary judgment. ABC also executed two security agreements in December 2007 ("Security Agreements") granting Ingram Micro security interests in ABC's equipment, inventory, accounts, and chattel paper, as security for ABC's debts to Ingram Micro. Most importantly, Ingram Micro requested that Beheshtin and Prosser each execute a personal guaranty for ABC's debts to Ingram Micro. Both did so, executing essentially identical guaranties. Beheshtin actually signed two copies of a personal guaranty agreement ("Personal Guaranty"), one of which is dated December 14, 2007, and the other December 17, 2007.[3] The Personal Guaranty states that Beheshtin "hereby unconditionally and

---

[2] As there is complete diversity of citizenship between the parties, and the matter in controversy exceeds $75,000, diversity jurisdiction is proper in this case. *See* 28 U.S.C. § 1332(a).

[3] The documents are identical; both are signed by Beheshtin; only the dates and notarizations differ, and none of these differences are material to the summary judgment analysis. Beheshtin initially refused to acknowledge that he had signed the documents. Ingram Micro then retained a

irrevocably guarantees the full and prompt payment to Ingram [Micro] when due, whether by acceleration or otherwise, of any and all Indebtedness (as hereinafter defined") of [ABC]." The term "[i]ndebtedness" is defined in the Personal Guaranty as

> any and all indebtedness and other liabilities of [ABC] to Ingram [Micro] of every kind and character . . . whether the indebtedness is from time to time reduced, increased, or extinguished and thereafter reincurred.

The Personal Guaranty also requires that Beheshtin "defend and indemnify Ingram [Micro] of and from any claim or loss under this Guaranty including reasonable attorneys' fees and expenses."

The Personal Guaranty also includes a number of additional clauses pertinent here. First, Beheshtin "waive[d]" and "acknowledge[d] that this Guaranty and Guarantor's obligations hereunder shall not be affected by . . . any dissolution, merger, consolidation or change in the form of organization, name or ownership of, or insolvency . . . of [ABC], Guarantor, any other guarantor or other party." Second, the Personal Guaranty includes a clause stating that the agreement "shall not be modified or affected" by any act "unless in writing," as well as a standard integration clause indicating that the parties have not relied on any acts or statements not mentioned in the documents themselves. Third, the Personal Guaranty authorized Beheshtin to terminate the guaranty by sending notice in writing to Ingram Micro, and the termination would become effective ten days after actual receipt of the notice by Ingram Micro. Once effective, the termination would end Beheshtin's obligations with respect to any indebtedness incurred after the termination, but he would remain obligated for any amounts that were subject to the Personal Guaranty prior to the termination. Finally, the Personal Guaranty contained a choice of law clause selecting New York law.

---

handwriting expert to analyze the signatures, after which Beheshtin conceded that he signed both copies of the Personal Guaranty.

Ingram Micro began selling products to ABC in December 2007 following execution of the Reseller Agreement, the Security Agreements, and Beheshtin's and Prosser's Personal Guaranties. As the relationship continued, Ingram Micro allowed ABC to purchase more equipment until ABC accumulated $640,000 in debt. In 2008, after a dispute among the owners of ABC, an agreement was reached whereby Prosser became ABC's new majority owner.[4]

Beginning in late 2009, ABC defaulted on its monthly payments to Ingram Micro. Thereafter, Ingram Micro sent a demand letter to Beheshtin on or about February 16, 2010, seeking payment of ABC's outstanding debt. When Beheshtin failed to pay, Ingram Micro filed this action on March 9, 2010, against ABC and guarantors Prosser and Beheshtin for $642,193.02, the amount due for payment of unpaid invoices plus costs, reasonable attorneys' fees, and 1.5% interest per month as specified in the Reseller Agreement. Sometime thereafter, ABC filed for bankruptcy, and the bankruptcy court lifted the automatic stay to allow this matter to proceed. *In re ABC Management Solutions*, No. 10-12865 (Bankr. E.D. Va. May 19, 2010) (Consent Order). On July 7, 2010, two consent judgments were entered in favor of Ingram Micro, one against ABC and the other against Prosser, each in the amount of $637,193.02.[5] Given that Ingram Micro has resolved its claims against ABC and Prosser,[6] the only remaining active claim in this case is Ingram Micro's breach of guaranty claim against Beheshtin.

---

[4] Beheshtin and ABC dispute whether Beheshtin remained a part-owner of the company after this change. This dispute is not material to the summary judgment analysis.

[5] Ingram Micro has not recovered any of the funds or property from ABC or Prosser pursuant to the consent judgments.

[6] Ingram Micro's complaint contained four claims: Count I alleged breach of contract against ABC; Count II sought recovery against ABC on an open account; Count III alleged breach of guaranty by Beheshtin; and Count IV alleged breach of guaranty by Prosser.

## II.

Analysis properly begins with the choice of law issue, which is easily resolved here as the Personal Guaranty in issue contains a valid and enforceable clause selecting New York law. Because this is a diversity action, the governing substantive law, including choice of law rules, is that of the forum state—in this case, Virginia. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). And it is well-recognized that "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Colgan Air*, 507 F.3d at 275; *Tate v. Hain*, 181 Va. 402, 25 S.E.2d 321, 325 (Va. 1943) (holding that the intent of the parties to choose governing law "'will always be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law'") (quoting 11 Am. Jur. Conflict of Laws § 119). No such circumstances exist here; thus, the law of New York governs matters arising from the Personal Guaranty.

## III.

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless that party adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322.

## IV.

The parties' cross motions for summary judgment present a straightforward matter of contract interpretation. New York courts have held that "[t]he interpretation of a contract of suretyship[7] is governed by the standards which govern the interpretation of contracts in general." *General Phoenix*, 300 N.Y. at 92. As in any matter of contract interpretation, "the intention of the parties should control, and the best evidence of intent is the contract itself." *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010) (alterations and ellipsis omitted). Where the contractual agreement is "complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Id.* Parties must be held to the terms for which they bargained, and "a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).

In this case, the terms of the Personal Guaranty are clear and unambiguous. The guaranty explicitly makes Beheshtin liable for "any and all indebtedness and other liabilities of [ABC] to Ingram [Micro] *of every kind and character . . . whether the indebtedness is from time to time reduced [or] increased.*" (Emphasis added.) Thus, the Personal Guaranty, in clear and unambiguous language, states that ABC's debt to Ingram Micro may change over time, and no matter how extensive the debt may become, Beheshtin remains personally liable for the debt. This clearly-stated intent of the parties must be given effect. *See Cont'l Ins.*, 603 F.3d at 180.

---

[7] Any minor differences between suretyships and guaranties under New York law do not alter the central tenet that ordinary principles of contract interpretation apply to the construction of guaranties. *See General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 92 (1949) (noting that general principles of contract interpretation cover both guaranties of payment and guaranties of collection); *Valley National Bank v. Greenwich Ins. Co.*, 254 F. Supp. 2d 448, 453 (S.D.N.Y. 2003) (noting that the "main distinction" between a surety and a guarantor is that the former typically guaranties payment of the debt jointly and severally with the principal obligor, while the latter guaranties collection only upon default of the principal obligor).

Seeking to avoid this result, Behehstin offers five arguments:

i. That a personal guaranty with no upper limit is unenforceably vague;

ii. That the original Reseller Agreement indicates on its face that the "Credit Limit Amount Requested" is $30,000, thereby setting a permanent cap on ABC's potential debt;

iii. That the Reseller Update Form signed November 14, 2008, which requests a credit line of $150,000, materially changed the terms of the agreement between Ingram Micro and ABC and thereby excused Beheshtin from his guaranties;

iv. That the Reseller Update Form, which put Ingram Micro on notice that Beheshtin was no longer an owner of ABC, served as notice of termination of Beheshtin's Personal Guaranty; and

v. That Beheshtin's secretary contacted Ingram Micro in July 2008 concerning Beheshtin's status as a guarantor and was told that he was not liable under any personal guaranty.[8]

None of these arguments provides a basis for Beheshtin to escape his obligation to pay ABC's debts to Ingram Micro.

Beheshtin's first argument—that the Personal Guaranty is fatally vague in the absence of an upper limit on the debt—is meritless. No New York case has been cited, nor has any been found, holding that a Personal Guaranty is fatally vague in the absence of an upper limit. To the contrary, New York courts recognize the validity of a Personal Guaranty that, as here, has no upper limit and is contemplated to vary over time. To be sure, an enforceable agreement does not exist where "the parties have failed to agree on all of its essential terms or if some of the terms are too indefinite to be enforceable." *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 252 (2d Cir. 1985). Yet, Beheshtin's Personal Guaranty is not missing an essential term; to the contrary, it clearly states that Beheshtin "hereby unconditionally and

---

[8] Beheshtin also claims that the Personal Guaranty establishes a suretyship and not a guaranty. Yet, as Ingram Micro correctly notes, any distinction between the two has no bearing on the summary judgment analysis. *See* n.7, *supra*.

irrevocably guarantees the full and prompt payment to Ingram [Micro] . . . of any and all Indebtedness . . . of [ABC]," which may "from time to time . . . [be] increased." The amount of Beheshtin's obligation under the Personal Guaranty is easily ascertainable, even though it may vary over time. As one New York appellate court put it,

> [i]mplicit in such a broad agreement to guarantee payment of all debts, including those not yet in existence, is an acknowledgment that the particular terms and conditions of those [underlying] obligations are not material, except insofar as expressly or implicitly set forth in the guaranty itself.

*Trustco Bank N.Y. v. Sage*, 656 N.Y.S.2d 542, 543 (N.Y. App. Div. 1997). A district court in New York applying New York law recognized that such a guaranty, generally known as a "continuing guaranty," covers "obligations within its scope incurred after the guaranty is signed and survives modifications to existing obligations." *See United Natural Foods, Inc. v. Burgess*, 488 F. Supp. 2d 384, 394 (S.D.N.Y. 2007). Notably, the "typical language" of a continuing guaranty covers "all indebtedness" of the guaranteed party to the creditor "of every kind and character." *Id.* Beheshtin's Personal Guaranty contains precisely this language, leaving no question that it is a valid continuing guaranty.

In response, Beheshtin cites no contrary New York authority, but simply notes that the Personal Guaranty's plain terms provided him with no protection against ABC borrowing an extreme amount from Ingram Micro. The short answer to this is that Beheshtin expressly agreed to this result. Moreover, at the time he signed the Personal Guaranty, Beheshtin was an owner of ABC, placing him in a position to avoid this result by ensuring that ABC did not overextend itself financially. Once Beheshtin left ABC and lost this control, he had the power to terminate the guaranty on a prospective basis. He declined to do so and thus remained liable for the full amount of ABC's debt.

Beheshtin's second argument—that the "Credit Limit Amount Requested" on the original Reseller Agreement placed an upper limit on his liability—is equally meritless as it is also flatly contradicted by the plain language of the Personal Guaranty. As noted, the Personal Guaranty makes unmistakably clear that it applies not only to the debt described in the Reseller Agreement, but also "any and all indebtedness" of ABC to Ingram Micro "of every kind and character." The Personal Guaranty further states that this obligation applies even if ABC's "indebtedness is from time to time . . . increased." Additionally, the Personal Guaranty contains an integration clause that specifically disclaims reliance on any other documents, which includes the Reseller Agreement.

Also worth noting is that Beheshtin misunderstands the meaning and effect of the "Credit Limit Amount Requested" clause. This clause does not, as Beheshtin supposes, impose an obligation on ABC to refrain from incurring more than $30,000 of credit from Ingram Micro. Importantly, the credit limit exists not to protect ABC's guarantors, nor to protect ABC from overextending itself, but instead, the credit limit places an upper limit on Ingram Micro's obligation to extend ABC credit under the Reseller Agreement. Since the "credit limit" in the Reseller Agreement only caps Ingram Micro's obligation, Ingram Micro may, if it wishes, waive this limitation, as it did, and extend ABC additional credit. This follows from the fundamental principle that "either party to a contract is at liberty to waive any of its provisions which are made for his benefit." *Knight v. Kitchin*, 237 A.D. 506, 512 (N.Y. App. Div. 1933). As such, the "Credit Limit Amount Requested" in the Reseller Agreement does not affect Beheshtin's obligation under the Personal Guaranty.

Beheshtin's reliance on a similar "credit limit" clause in the Reseller Update Form is likewise misplaced. This third argument from Beheshtin relies on the fact that Prosser sent

Ingram Micro a Reseller Update Form on November 14, 2008, which, among other things, requested a line of credit for ABC in the amount of $150,000. Beheshtin argues that this higher credit request materially altered, and thus nullified, his Personal Guaranty. This argument fails because, as already noted, the "Credit Limit Amount Requested" did not limit Beheshtin's liability under the Personal Guaranty. *See Trustco*, 656 N.Y.S.2d at 543 (noting that the terms of underlying financial agreements are not material to a continuing guaranty as such terms are understood to be subject to change over time). Accordingly, Prosser's request for a greater line of credit did not affect, much less excuse, Beheshtin's obligation under his Personal Guaranty.

In his fourth argument, Beheshtin notes that after receiving the Reseller Update Form, Ingram Micro was on notice that Beheshtin no longer had an ownership role in ABC. Based on this change, Beheshtin argues that he was no longer liable under the Personal Guaranty. As an initial matter, Beheshtin's assertion is contradicted by his own deposition, in which he repeatedly claims that he retained some degree of ownership in ABC until ABC declared bankruptcy in 2010. *See* Beheshtin Dep. 67-69. In any event, Beheshtin's ownership status is not a condition of his Personal Guaranty. Indeed, Beheshtin expressly agreed in the Personal Guaranty that his obligations "shall not be affected by . . . any . . . change in the form of ownership" of ABC. Beheshtin had the power to terminate the Personal Guaranty on a prospective basis at any time, but he could only do so through an unequivocal communication to Ingram Micro, in writing, stating his desire to terminate the guaranty. Because he failed to do so, Beheshtin remains liable notwithstanding any change in ABC's ownership structure.

Beheshtin's final argument is also without merit. In essence, Beheshtin argues that Ingram Micro cannot rely on the Personal Guaranty because Beheshtin's secretary called Ingram Micro and spoke to an unidentified Ingram Micro employee who stated that Beheshtin had no

guaranties outstanding. Quite apart from the hearsay nature of this statement,[9] this argument fails because Beheshtin's reliance on the statement was unreasonable. Beheshtin's argument rests on the doctrine of equitable estoppel, which "precludes a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted." *Matter of Shondel J. v. Mark D.*, 853 N.E.2d 610, 613 (N.Y. 2006). The critical language for the purposes of this case is the qualification that the belief be "reasonable." *Id.* According to Beheshtin, he believed that his financial obligations under the Personal Guaranty, which were substantial, evaporated the moment an unknown employee from Ingram Micro told Beheshtin's secretary that no guaranties existed. Beheshtin neither followed up on this call by personally communicating with anyone at Ingram Micro, nor did he so much as ask the identity of the employee at Ingram Micro who allegedly made this statement. In no sense, therefore, was Beheshtin's reliance on such a conversation reasonable, even assuming it occurred as alleged. Moreover, the Personal Guaranty expressly forbids oral modifications. As such, a phone call with an Ingram Micro employee could not fundamentally alter, or for that matter dissolve, the Personal Guaranty between Beheshtin and Ingram Micro. Accordingly, the phone conversation cannot excuse Beheshtin's obligation under the Personal Guaranty.

Given that this record leaves no genuine dispute as to Beheshtin's obligation to pay the full indebtedness of ABC, Ingram Micro is entitled to summary judgment on its claim against Beheshtin. Furthermore, since the agreement explicitly imposes liability on Beheshtin to pay reasonable attorneys' fees to Ingram Micro, an award of reasonable attorneys' fees is also

---

[9] To the extent the statement of the unidentified Ingram Micro employee is admitted to prove that Beheshtin had no personal guaranties in effect at the time of the call, the statement would be inadmissible hearsay. *See* Rules 801-02, Fed. R. Evid. Yet, even if the statement were to fit within an exception to the hearsay rule—such as the state-of-mind exception in Rule 803(3), Fed. R. Evid.—Beheshtin's argument still fails for the other reasons stated.

appropriate. *See United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 74 (2d Cir. 2004) (noting that attorneys' fees are recoverable where an enforceable contract explicitly provides for such recovery).

An appropriate Order will issue.

Alexandria, Virginia
September 29, 2010

/s/
T. S. Ellis, III
United States District Judge